UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM F. PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-4-B-W |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION**

In an action tried before the Court under the Federal Tort Claims Act, the Court concludes that William Patterson failed to demonstrate that the United States Postal Service was negligent, and further, the United States demonstrated that Mr. Patterson's comparative negligence exceeds any negligence on the part of the Postal Service.  The Court grants judgment in favor of the United States of America.

**I.      STATEMENT OF FACTS**

**A.      William Patterson and the Fall**

On December 23, 2006, William Patterson, then a seventy-four-year-old resident of Harmony, Maine, pulled on his cowboy boots, donned his jacket, and headed out with his wife to complete their Saturday morning routine.  They got in his Chevy S-10 Blazer and he drove to the Breakfast Nook for eggs and sausage.  After breakfast, they headed to the Harmony post office to pick up the mail, arriving just after 10:00 a.m.  The parking lot was full, so Mr. Patterson parked on the gravel shoulder of Main Street.  While his wife waited in the Chevy, he got out and started for the concrete walkway that runs directly from Main Street across the lawn to the front entrance of the post office.

It was not much of a day.  National Weather Reports from Waterville, Maine, about thirty miles away confirm that it began to precipitate at about 11:00 p.m. on December 22 and continued lightly throughout the morning of the twenty-third.[1]  Witnesses described the precipitation as freezing rain or sleet.  Being Maine in December, there was some snow, and the freezing precipitation resulted in a slushy, icy, snowy layer on the ground.

As Mr. Patterson rounded the front of his vehicle, he came upon a natural four-inch gradient that separates the roadway and the lawn.  Mr. Patterson noticed the top of the ridge was icy.  He also noticed that the concrete walkway, which consisted of a series of poured concrete squares running from the street to the post office, was glare ice, and he decided that the lawn alongside the walkway was safer.  He proceeded beside the walkway, entered the post office, collected his mail, and headed back to his vehicle.  Again facing the icy concrete walkway, he retraced his steps along the less-traveled path.  Not finding the lawn itself slippery, he negotiated it without difficulty.  But, as he neared his S-10, at the edge of the lawn he reencountered the natural four-inch drop to the gravel shoulder.  He put his left foot on the icy top of this small ridge and strode with his right foot down onto the shoulder.  As he did, his left foot slipped on the ice on the top of the ridge, and his foot went out from under him.  He fell hard, breaking his right hip.

Mr. Patterson was taken by ambulance to Mayo Regional Hospital, where his hip was surgically pinned.  He recovered well from surgery, spent about three weeks at the Hibbard Nursing Home doing physical therapy, and then returned to live with his wife in Harmony.  He has some bothersome residuals.  He has developed a limp and experiences a momentary, painful

---

[1] The Plaintiff objected to the admission of the weather report from Waterville, arguing it was too far away and he had weather records from Harmony itself.  After the Court admitted the Waterville records over his objection, he failed to seek the introduction of the Harmony weather records.  The Court is left only with the weather records from Waterville.

catching of his right hip when he stands after sitting for too long.  He is unable to continue quite the same range of activity he engaged in before the fall.  But, all told, he has recovered well.  He has no pain when he walks, does not require any medicine for the hip, and has not seen a doctor for the hip for about eighteen months.

### B.     Faith Bussell and the Harmony Post Office

Faith Bussell grew up in Harmony and lives just two doors down from the Harmony post office.  She began working for the Harmony post office in July 2006 as postmaster relief replacement, a job that required her to fill in for the postmaster on Saturdays, holidays, and days when the postmaster was not working.  December 23 was a Saturday and Ms. Bussell was filling in.  During the time before the accident, Ms. Bussell was the only Postal Service employee at the post office; the other two employees were delivering mail.

Ms. Bussell said that she normally arrived at the post office at about 7:30 a.m.; however, if the conditions were slippery, she would arrive earlier.  On December 23, she noticed her driveway was slippery and she therefore arrived at the post office sometime between 7:00 a.m. and 7:30 a.m.  Upon arrival, she took buckets of sand and salt available in the post office and salted and sanded the parking lot and walkways, including the concrete walkway that ran to Main Street.  She had never received any training about when and how to do this.  She simply understood that sanding and salting the walkways during the wintertime was part of her job.

She then went about sorting the mail.  The Harmony post office opened at 7:30 a.m., but only for postal box customers.  Ms. Bussell had developed her own pattern of checking on the outside conditions on an hourly basis during a winter storm.  This hourly monitoring was not something she was told to do, but something she developed on her own.[2]  In accordance with this

---

[2] Ms. Bussell's testimony on this point is confusing.  She began working for the Harmony post office as a substitute in July, and she only regularly worked Saturdays.  Before December 23, 2006, she said that she had never been

3

normal practice, just before 9:00 a.m., when the customer window opened, Ms. Bussell went out and salted and sanded the walkways again.  When she went outside at that time, she noticed that the conditions had deteriorated and required reapplication of sand and salt, and she agreed that the weather conditions were likely to present a recurring problem throughout that morning. Nevertheless, after she opened the customer window at 9:00 a.m., Ms. Bussell remained at the customer window, and did not check outside conditions at 10:00 a.m.

There are 220 post office boxes at the post office and about eighty percent of box-holders come daily to pick up their mail.  On an average Saturday morning, therefore, about 180 box-holders come to the post office; and, on a typical Saturday, an additional thirty to forty customers come to the window for service, sometimes causing a line.  Ms. Bussell testified that somewhere between seventy-five and one hundred people had been to the post office before Mr. Patterson fell that day, an estimate which seems consistent with higher traffic the last mail day before Christmas.  The post office attracts a wide range of customers, including elderly and disabled people, and Ms. Bussell acknowledged that the Postal Service was aware that people often come to the post office despite inclement weather.  Ms. Bussell also confirmed that as there are fewer than ten parking spaces in the post office parking lot, it was not uncommon for customers to park on the gravel shoulder of Main Street and to access the post office by either cutting across the lawn or using the concrete walkway, and she knew it was the Postal Service's responsibility to ensure that the walkway was not unreasonably icy and slippery.  From the time she opened the post office until Mr. Patterson's fall, none of the customers complained to her about the condition of the walkway.

---

confronted with bad weather.  At the same time, she agreed that she had developed her own routine for checking the outside premises on an hourly basis whenever there was bad weather.  How she could have developed a routine for handling bad weather, when she had never before experienced bad weather, was never explored.

At about 10:15, Regina Herrick, a customer, informed her that Mr. Patterson had fallen. Ms. Bussell called an ambulance and as it turns out, an Emergency Medical Technician, who lived nearby, heard the emergency call and came immediately to the scene.  Ms. Bussell recalls seeing Mr. Patterson standing beside his vehicle, but she has no memory of the condition of the walkway at the time of the fall.

Ms. Bussell was aware that the Postal Service had contracted with Jason McGinley, a local contractor, for the removal of snow at the post office.  Ms. Bussell knew that Mr. McGinley would not come unless he was called, and Ms. Bussell admitted that even though she had Mr. McGinley's name and number and could have contacted him to come to the post office to apply sand and salt to the icy walkway, she did not.

### C.      Ronald Robinson – The Good Neighbor

Ronald Robinson owns C & R General Store in Harmony and knows most of the people in the town.  Mr. Patterson is a regular customer and Ms. Bussell had worked for him in the past. Mr. Robinson arrived at the post office the morning of December 23, 2006 just after Mr. Patterson fell, and he noticed that the exterior walkway leading to Main Street was very icy.  He went inside and saw that Ms. Bussell was behind the counter waiting on customers.  Mr. Robinson offered to salt the walkway for her.  Ms. Bussell gave Mr. Robinson some salt and he proceeded outside and applied a sufficient amount of salt on the walkway to render it safer.[3]

### D.      Jason McGinley – The Plow Operator

Jason McGinley is a thirty-five-year resident of Harmony, and holds the plowing and sanding contract with the Harmony post office.  Mr. McGinley said the post office paid him $35 each time he plowed, and that he generally used his discretion about whether the post office

---

[3] The Government objected to Mr. Robinson's testimony under Rule 407.  Fed. R. Evid. 407.  The Court overruled the objection after the Plaintiff indicated that he was seeking introduction of the evidence only to demonstrate feasibility.  Mr. Robinson's testimony was therefore admitted for a limited purpose.

needed his services.  Mr. McGinley's plowing services included shoveling, salting, and sanding the walkway running from the post office to Main Street.  He said that depending on the conditions, once he applied salt and sand, it might be a couple of hours before another application was necessary.  Mr. McGinley had neither plowed nor sanded for the post office the morning of the accident.  Instead, he went to the post office that morning to pick up his mail.  He parked on Main Street just ahead of Mr. Patterson's Chevy S-10.  As he arrived, he observed Mr. Patterson leaning against the front of his vehicle.  Mr. McGinley proceeded inside and retrieved his mail.  In light of what had happened, he said that he had looked at the conditions both on the way in and out, and concluded the conditions seemed all right.  He took no further action.  As he recalled, during the time he was at the post office, it had stopped precipitating.

E.      **Marie S. Lougee – The Surveyor**

Marie Lougee is a resident of Harmony and is a licensed land surveyor.  After the accident, she performed a survey of the lot on which the post office is located, including the walkway leading from the front door to Main Street.  The total distance from the front of the building to the road is twenty feet; however, the distance from the front of the building to the post office lot's property line is thirteen feet.  In other words, there is a seven-foot-wide corridor between Main Street and the post office that appears to be post office property, but is not.  More specifically, the post office does not own the area where Mr. Patterson fell.[4]

## II.      LEGAL STANDARDS

The Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner

---

[4] Technically, the Postal Service does not own, but leases the lot on which the post office building is located.  But neither party has argued that its status as a lessee makes a legal difference in this case and for the sake of simplicity, the Court has referred to the Postal Service as the owner.  *See Benham v. Morton & Furbish Agency*, 2007 ME 83, ¶ 15, 929 A.2d 471, 474 (stating that a landlord "is not liable for injuries caused by defective conditions in areas that are within the exclusive possession and control of a lessee" (internal quotation omitted)).

and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The Plaintiff bears the burden to establish the liability of the United States "by showing that a private individual would be liable under state law – Maine law, in this case – for similar conduct in the same circumstances." *Clement v. United States*, 772 F. Supp. 20, 26 (D. Me. 1991). The Plaintiff's cause of action must be "tried by the court without a jury." 28 U.S.C. § 2402.

### A.    General Principles of Premises Liability

The elements of premises liability, as with any claim for negligence, include: (1) duty, (2) breach of that duty, (3) causation, and (4) harm to the plaintiff. *Durham v. HTH Corp.*, 2005 ME 53, ¶ 8, 870 A.2d 577, 579; *Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951, 954. In slip and fall cases, a "business owner owes a positive duty of exercising reasonable care in providing reasonably safe premises[,] when it knows or should have known of a risk to customers on its premises." *Durham*, 2005 ME 53, ¶ 8, 870 A.2d at 579 (internal quotation and punctuation omitted).

### B.    Duties of a Possessor of Land

To impose premises liability, Maine law generally requires that the defendant both possess and control the premises. *Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304-05 (Me. 1991); *Hoops v. PR Rests. LLC*, No. CV-06-282, 2007 Me. Super. LEXIS 251, at *4-5 (Me. Super. Ct., Cum. Cty., Dec. 27, 2007); *Stow v. Peterson*, 204 F. Supp. 2d 40, 43 (D. Me. 2002) (stating that a defendant's duty of care may be established by showing that the defendant had an ownership interest in, was the possessor of, or exercised "some control over the property at the time of the injury"). In *Quadrino*, the plaintiff was walking from a motel and restaurant into a city, and as he crossed the defendant bank's driveway, he tripped on a curb and fell. *Quadrino*, 588 A.2d at 304. Although he landed on the bank's property, the curb that

caused his injuries was maintained by the Maine Department of Transportation, on property owned by the motel. *Id.* On appeal from the trial court's grant of summary judgment for the bank, the Supreme Judicial Court of Maine, sitting as the Law Court, held that because the bank "had no possessory interest in the curb at the time of the plaintiff's injury, the court did not err in ruling that defendant owed plaintiff no duty of care." *Id.* at 305.

In *Denman v. Peoples Heritage Bank, Inc.*, 1998 ME 12, 704 A.2d 411, the Law Court explained the special rules that apply to an owner of land abutting a public sidewalk. The plaintiff in *Denman* slipped and fell on ice and snow that had accumulated on a public sidewalk abutting the defendant bank's property. 1998 ME 12, ¶ 2, 704 A.2d at 413. Under Portland City Ordinance, as an abutting landowner, the bank was required to remove snow and ice from the sidewalk and hired a third party to do so. *Id.* ¶¶ 4-6, 704 A.2d at 413. On the day of the accident, the contractor had neither shoveled nor sanded the sidewalk before the plaintiff fell. *Id.* ¶ 2, 704 A.2d at 413. The Law Court reiterated the general rules of premises liability: a possessor of land owes persons lawfully thereon a duty of care, and possession turns on an intent to control the premises. *Id.* ¶ 4, 704 A.2d at 413. The Court also noted the special rule that, without more, mere ownership of land abutting a street or sidewalk does not impose a duty to passers-by to remove naturally accumulated snow and ice. *Id.* ¶ 6, 704 A.2d at 414 (instructing that an abutting landowner is under no duty "'to keep the sidewalk clear of ice and snow coming thereon from natural causes, or to guard against the risk of accident by scattering ashes or using other like precautions, whether or not any public duty was imposed upon him by the ordinances of the city'" (quoting *Ouelette v. Miller*, 134 Me. 162, 166, 183 A. 341, 343 (1936))). Accordingly, the Court was unconvinced by plaintiff's argument that the bank's snow and ice removal contract manifested its intent to control the sidewalk, leading to the conclusion that the

bank possessed the sidewalk and had a legal duty to make it safe.  To the contrary, the Law Court stated that "the public duty imposed on defendants by municipal ordinance does not give rise to a duty enforceable by plaintiff."  *Id.* ¶ 7, 704 A.2d at 414.

The *Denman* limitation on liability is subject to a special exception, however, under which an occupier of land may cause its duty of care to extend to premises it does not own and over which it does not have exclusive control.  For example, an occupier of land has a duty to remedy or warn of a defect if it has "manifested an intention to have control over the land on which the defect was located."  *Pelletier v. Fort Kent Golf Club*, 662 A.2d 220, 222 (Me. 1995). Thus, the "duty owed to business invitees can extend 'beyond the precise boundaries of the premises under [the invitor's] control or occupancy to include the approaches which they are expressly or impliedly invited to use or which they would be reasonably expected to use, even though these approaches be not under the invitor's absolute control.'"  *Id.* (alteration in original) (quoting *Libby v. Perry*, 311 A.2d 527, 535 (Me. 1973)).  In *Pelletier*, the plaintiff was injured when her golf ball struck her after ricocheting off railroad tracks that crossed the first fairway of the defendant's golf course.  *Id.* at 221.  The club was held responsible for the plaintiff's injuries even though a railroad owned the tracks and the land on which they were situated, and the tracks were not under the club's "absolute control."  *Id.* at 222.  Observing that the club had instituted a special "free lift" rule in relation to the tracks and "invited golfers to use the course, which necessarily involved traversing the tracks," the Law Court concluded that the golf club's "duty extends to land which it has invited golfers to use."  *Id.*

Similarly, in *Libby v. Perry*, a business invitee[5] of the Augusta Armory Committee, which had rented the Armory for a New Year's Eve ball, was injured when he slipped on ice in

---

[5] By statute, the "standards of care for a social invitee shall be the same as that of a business invitee."  14 M.R.S.A. § 159; *Stow*, 204 F. Supp. 2d at 43.

an adjacent parking lot.  311 A.2d 527, 529, 535-36.  The lot, which was not part of the rental agreement and was neither occupied nor controlled by the Committee, had been left untreated from a freezing rainstorm the previous day.  *Id.*  Upholding a jury verdict against the Committee's individual members, the Law Court concluded that their duty of care to the invitee extended to the adjacent lot, an "immediate areaway which . . . [he] was either invited to use, or which he would be reasonably expected to use, to make his exit from the premises upon which he had been invited to come."  *Id.* at 535.

### C.    Winter Storms and Premises Liability in Maine

Although some jurisdictions have adopted the "storm in progress" doctrine, which allows a business owner to wait a reasonable time after the end of a storm before attempting to correct the situation, Maine has not.  *Budzko v. One City Ctr. Assocs.*, 2001 ME 37, n.2, 767 A.2d 310, 314 (stating that the "storm in progress" rule "appears inconsistent with the duty of reasonable care owed by a business owner reasonably anticipating a significant number of invitees during a Maine winter storm").[6]  Under Maine law, "a business owner who anticipates that 500 or 1000 invitees may enter and leave its premises during a snow or ice storm has a duty to reasonably respond to a foreseeable danger posed to the invitees by a continuing snow or ice storm.  That duty is not fulfilled by [defendant's] argument that it could wait until after the storm to take any action, regardless of the risk posed to its invitees during the storm."  *Id.* ¶ 13, 767 A.2d at 314. In *Alexander v. Mitchell*, the Law Court emphasized that *Budzko* had not created an "openended duty" on the part of the landowner to remove snow and ice.  2007 ME 108, ¶ 24, 930 A.2d 1016,

---

[6] Before *Budzko*, dicta suggested Maine may have adopted a limited version of the "storm in progress" doctrine for sleet and freezing rain storms.  In *Isaacson v. Husson College*, the Law Court observed that the snowstorm that brought forty-two inches of snow to the defendant's campus "was not the freezing rain or sleetstorm during which, under the general rule, the invitor is not required to remove the freezing precipitation as it falls, but is only duty bound to take appropriate corrective action within a reasonable time after the storm has abated."  297 A.2d 98, 104 (Me. 1972).  However, *Budzko* rejected defendant One City Center's argument that "it was under no duty to remove accumulating, freezing precipitation from a stair landing located on its premises as the precipitation fell during a winter storm."  *Budzko*, 2001 ME 37, ¶ 1, 767 A.2d at 312.

10

1023.  The *Alexander* Court clarified that in *Budzko*, the defendants "were charged with the ordinary responsibility of a landowner, regarding a small and manageable part of its property, to make reasonable efforts to reduce risks to those using the property."  *Id.*  Maine law imposes this duty in part because snow and ice are recurrent conditions in the wintertime in Maine, and a possessor of land "'aware of the existence of a recurrent condition that poses a potential danger to invitees may not ignore that knowledge and fail reasonably to respond to the foreseeable danger of the likelihood of a recurrence of the condition.'"  *Budzko*, 2001 ME 37, ¶ 12, 767 A.2d at 314 (quoting *Dumont v. Shaw's Supermarkets, Inc.*, 664 A.2d 846, 849 (Me. 1995)).

To say that the possessor of land may not wait out a storm is not to impose an absolute obligation to prevent accidents arising from winter weather.  In the context of winter driving, *Alexander* observed that "the common law in this state has not assigned open-ended responsibility for snow-related accidents" and "[o]ur common law reflects the widely held public acceptance of heavy snowfall and difficult driving as facts of life in Maine."  *Alexander*, 2007 ME 108, ¶ 18, 930 A.2d at 1021.  In winter weather, the possessor of land owes a "'duty of exercising reasonable care in providing reasonably safe premises . . . when it knows or should have known of a risk to customers on its premises.'"  *Budzko*, 2001 ME 37, ¶ 11, 767 A.2d at 314 (alteration in original) (quoting *Currier v. Toys 'R' Us, Inc.*, 680 A.2d 453, 455 (Me. 1996)); *Hall-Wagner v. GMRI, Inc.*, No. 05-28-P-H, 2005 U.S. Dist. LEXIS 39538, at *16 (D. Me. Nov. 23, 2005).

## III.    DISCUSSION

### A.    The Postal Service's Liability

In his Maine Jury Instruction Manual, Justice Alexander provides a roadmap for analyzing a wintertime slip and fall case:

The owner of a building has a duty to use reasonable care to maintain the premises in reasonably safe condition.  To recover in this case the plaintiff must prove by a preponderance of the evidence that:

1.  There was an accumulation of snow and/or ice on the premises that was a proximate cause for her injuries;

2.  The snow and/or ice condition had been present for a time of sufficient duration prior to plaintiff's injury to enable a reasonably prudent person to discover and remedy [or warn of] it; and

3.  The defendant knew of the snow and/or ice condition and did not correct [or warn of] it, or did not know of the snow and/or ice condition but in the exercise of reasonable care should have known of and corrected [or warned of] the condition.

Donald G. Alexander, *Maine Jury Instruction Manual* § 7-64 (4th ed. 2008) (alterations in original).[7]  As the parties stipulated that Mr. Patterson's fall caused his injury and medical expenses, *Stipulations* ¶ 2 (Docket # 22), the Court addresses in the following order only the first three elements of his negligence claim – duty, breach of duty, and proximate causation.  *See Durham v. HTH Corp.*, 2005 ME 53, ¶ 8, 870 A.2d 577, 579.

### 1.  The Postal Service's Duty of Care

Emphasizing that Mr. Patterson fell five feet beyond the post office's boundary line, the United States contends the Postal Service owed no legal duty to him.  It relies on *Alexander* and *Denman* for the proposition that "'owners and occupiers of the land abutting the street, do not owe a duty to others for injuries resulting from the natural accumulation of snow and ice.'" *Def.'s Trial Br.* at 5 (Docket # 26) (quoting *Alexander*, 2007 ME 108, ¶ 23, 930 A.2d at 1022 (citing *Denman*, 1998 ME 12, ¶ 6, 704 A.2d at 413-14)).  If the accident had taken place on a clearly demarcated sidewalk abutting Postal Service property, the United States would be on firmer footing.  However, the accident took place on the edge of an undifferentiated lawn beside

---

[7] Part three could be misinterpreted to mean that the reasonableness standard applies only when the landowner did not know of the condition.  However, even if the landowner knew of the condition, the failure to correct is still measured against a standard of reasonableness.

a coextensive walkway, which ran over the Postal Service's property line to Main Street and invited access for post office customers. Moreover, the Postal Service exercised control over the area by maintaining the entire walkway and lawn. The facts in this case fit neatly within the *Pelletier-Libby* exception to the *Alexander-Denman* limitation on liability.

Because this case fits in the *Pelletier-Libby* exception, the Postal Service owed a duty to Mr. Patterson to exercise "'reasonable care in providing reasonably safe premises . . . when it knows or should have known of a risk to customers on its premises.'" *Budzko*, 2001 ME 37, ¶ 11, 767 A.2d at 314 (alteration in original) (quoting *Currier v. Toys 'R' Us, Inc.*, 680 A.2d 453, 455 (Me. 1996)). Further, under *Libby*, included in the premises to which the Postal Service's duty extended were immediate areaways which Mr. Patterson "was either invited to use, or which he would be reasonably expected to use, to make his exit from the premises upon which he had been invited to come." *Libby*, 311 A.2d at 535.

### 2. Discharge or Breach of the Duty of Care

Whether the Postal Service breached its duty to Mr. Patterson depends on whether its actions were reasonable, considering the "totality of the existing circumstances." *Id.* at 536. These myriad circumstances include (1) what Ms. Bussell knew of the hazardous conditions; (2) what Ms. Bussell should have known about them, which depends on their duration and whether a reasonable person would have discovered them; and (3) how a reasonable occupier of land, exercising "ordinary care to ensure that the premises to be used are reasonably safe," *id.* at 535, would have responded to the dangerous conditions.

Analysis of these factors is complicated, because Mr. Patterson did not slip and fall on the walkway; he slipped and fell on the edge of the lawn adjacent to the walkway. Mr. Patterson says that he sought an alternative route because the walkway was so hazardous that the

alternative was safer.  Thus, Mr. Patterson's theory of liability is not that Ms. Bussell's failure to salt and sand the edge of the lawn directly caused his injury.  Instead, he claims that had Ms. Bussell reasonably salted and sanded the walkway, he never would have been forced to enter onto the lawn, where he was injured upon encountering a hazardous accumulation of ice distinct from the ice on the walkway.  Mr. Patterson's theory of indirect liability has implications for both the breach of duty and proximate cause elements of his claim.

The facts here are distinguishable from *Budzko*.  In *Budzko*, the court concluded that the "evidence supported the jury's implicit findings that [the landowner] failed to treat the ice with salt or sand, failed to shovel any of the accumulated snow or ice, and failed to warn its business invitees of the icy condition of the premises."  *Budzko*, 2001 ME 37, ¶ 15, 767 A.2d at 315.  As the landowner had failed to take any remedial action during the storm, the court concluded that "a reasonable view of the evidence supports the jury's verdict," because "[b]usiness owners have a duty to reasonably respond to foreseeable dangers and keep premises reasonably safe when significant numbers of invitees may be anticipated to enter or leave the premises during a winter storm."  *Id.* ¶ 16, 767 A.2d at 315.

By contrast, Ms. Bussell did sand and salt the walkway twice during the morning hours of December 23, 2006.  She testified that she did so between 7:00 a.m. and 7:30 a.m. and again just before 9:00 a.m.  The slip and fall here took place just after 10:00 a.m.  The question is whether Ms. Bussell's failure to sand or salt the walkway between 9:00 a.m. and just after 10:00 a.m., a span of about an hour, amounts to the failure to exercise reasonable care to maintain a reasonably safe premises.  In other words, unlike *Budzko*, where the landowner failed to take any steps to remediate the winter conditions, here the Postal Service took some steps, which the Plaintiff bears the burden of demonstrating were not reasonable.

14

There is no hard and fast rule for resolving whether a landowner's response to a winter storm is reasonable, since the determination depends upon so many variables, including the severity, duration, and nature of the winter storm; the frequency and nature of the remedial response; the utility of the response; the anticipated number of visitors; any evidence of customer complaints; and, the topography of the premises.   There are factors that favor Mr. Patterson. First, the Postal Service is a unique business.   Ms. Bussell acknowledged that people tend to come to the post office despite adverse weather conditions and that Saturday morning is an especially busy time, since the customer service window was open only for a limited time – from 9:00 a.m. to 11:00 a.m. – and she expected a high volume of customers during that interval. Second, Ms. Bussell was aware of the slippery conditions that morning, since she had encountered them herself.   Third, she was aware that during the hour and a half between 7:30 a.m. and 9:00 a.m. the weather conditions had persisted and the conditions outside had deteriorated to the point where additional salt and sand was required.   Fourth, she failed to call in the services of the Postal Service's outside contractor, Jason McGinley, despite the fact she had his name and number.   Fifth, Ms. Bussell received no training from the Postal Service on how to handle wintry conditions.   Sixth, Ms. Bussell testified that she adopted her own rule that she should check on outside conditions on an hourly basis and she violated her own informal rule. Finally, if she had complied with her own common sense one-hour guideline, she would have salted and sanded the walkway just before Mr. Patterson arrived and the walkway would likely have been in a safe condition for his use.

There are other factors, however, that do not favor Mr. Patterson.   The weather that day was freezing rain or sleet, and although the Maine rule applies with equal force during a freezing rain or sleet storm, the standard remains one of reasonable care.   As a practical matter, it is

difficult to know how long sanding and salting will remain effective during a given sleet or rain storm.  Although this was not a driving freezing rain or sleet storm, where it could be argued remedial efforts would have been ineffective, there was freezing precipitation throughout the morning and in these circumstances, reasonableness stands on a temporal continuum.

The record is equivocal.  Ms. Bussell admitted that an hour and a half of accumulation was long enough to require additional sand and salt.  Had Mr. Patterson fallen more than an hour and a half after the last application of sand and salt, Ms. Bussell's admission would tend to support a finding of unreasonableness in her response to the conditions she knew existed that morning.  But, there is no direct evidence how precisely long it took the walkway to glaze over in these weather conditions.  The weather records confirm that between 6:55 a.m. and 9:55 a.m. the temperature hovered between thirty-four and thirty-seven degrees, and it continued to precipitate at a rate of between 0.07 and 0.09 inches per hour.  Thus, it is reasonable to infer that the walkway became increasingly slippery between 9:00 a.m. and 10:00 a.m., but it is speculative exactly when within that hour it became so slippery that the failure to act became unreasonable.

Mr. Patterson's decision to use the lawn suggests that by shortly after 10:00 a.m. the walkway had reached a point where the lawn was safer.  But, it is speculative when, during that one-hour interval, this tipping point occurred.  If the walkway had become so icy that customers used the lawn within moments of Ms. Bussell's 9:00 a.m. application of sand and salt, the condition would have remained present for a sufficient length of time for her to have taken action.  If the walkway reached this point only moments before Mr. Patterson arrived, it is more difficult to conclude that the Postal Service was negligent.  There is, however, no direct evidence on the actual condition of the walkway during that one-hour interval.

16

The Court is not convinced by Ms. Bussell's personal hourly standard. There is no evidence how she came up with the notion that she should check the outside conditions hourly; she had never before been confronted as postmaster with adverse weather conditions, and in any event, the Court cannot find that Ms. Bussell should have applied her hourly checks so punctually that she necessarily should have made the check before Mr. Patterson fell just after 10:00 a.m. Mr. McGinley, who runs a plowing business, stated that in his experience salting and sanding might last a couple of hours, and if Mr. McGinley, whose business it is to salt and sand, uses a two hour standard, the temporal standard of reasonableness contains a certain flexibility.

One test of reasonableness is the actions of the customers themselves. Ms. Bussell testified that seventy-five to one hundred people had been to the post office before Mr. Patterson fell, and no one had complained to her about the condition of the walkway. Indeed, no one includes Mr. Patterson himself, who acknowledged that he knew Ms. Bussell, but did not mention the condition of the walkway to her when he entered the post office, because he figured that since he had been able to get from his vehicle to the post office, he would be able to get back. The heavy volume of postal customers that morning is, thus, a mixed factor. Although it formed a basis for the Postal Service's duty reasonably to respond to foreseeable dangers to its invitees, it is also true that between 7:30 a.m. and 10:00 a.m., despite the steady influx of customers, no one else slipped and fell and no one complained.

Ms. Bussell's failure to contact Mr. McGinley that morning is not convincing evidence of unreasonable conduct. Mr. McGinley plowed for the Postal Service, but he also plowed for the Fire Department and town residents. He said that he plowed and sanded when he felt it needed it, relying on his judgment; he also responded if called. But, Mr. McGinley, who was paid only if he worked, testified that he had not done any jobs that morning. Accordingly, he had made the

judgment that the conditions in Harmony that morning did not merit sanding and salting, not only for the post office, but for his other customers.  Although the Postal Service's situation was distinct because of the likely arrival of customers, the Court cannot find that the Postal Service – alone among Mr. McGinley's customers – required his services.

The Postal Service's failure to train Ms. Bussell runs mildly against the Defendant.  After all, the Postal Service was aware that Ms. Bussell, a neophyte fill-in postmaster, would be left alone to run the post office on Saturday mornings, and it should have anticipated the possibility of foul winter weather in this central Maine town.   Leaving her directionless was unwise, especially as to when she was to call Mr. McGinley and how to handle the dual responsibilities of waiting on customers and keeping the walkways safe.  On the other hand, winter weather is no mystery for Mainers, and most do not need instructions about how and when to shovel, sand, and salt.  They rely on common sense.  Furthermore, winter conditions are variable, making the effectiveness of such training questionable.

Finally, to conclude that the Postal Service is responsible requires a circuitous route.  Mr. Patterson wisely does not contend that Ms. Bussell should have sanded, salted, or shoveled the lawn of the post office, or more particularly the ridge between the lawn and the roadway, where he actually slipped and fell.  Rather, Mr. Patterson contends that the untreated walkway was so treacherous that he was required to seek a safer route, namely the lawn, including a ridge that he knew to be icy.  Mr. Patterson's theory, thus, has a logical inconsistency:  eschewing a route that had been salted and sanded for a route that had never been salted or sanded, but also a route no one would ever expect even the most compulsive landowner to remediate.  Put differently, for purposes of the claim of negligence against the Postal Service, if Mr. Patterson had slipped on the walkway, the theory of negligence would be direct, but, here, Mr. Patterson must

18

demonstrate that the hazard the walkway presented was sufficiently serious that the Postal Service should have anticipated that its customers would encounter the risks of an untreated area.

Again, the resolution centers on the condition of the walkway, but with a slightly different spin.  The components of a conclusion that the lawn is a safer route are surprisingly complex, an amalgamation of subjective life experience and basic science.  Mr. Patterson proffers the notion that due to such factors as the differing cooling properties of concrete and soil and the smoother surface of the walkway, at some tipping point, the Postal Service should have known that if it left the walkway untreated, customers would walk on the lawn, and once they elect the lawn, they are subject to the greater risks of untreated and slippery areas.

The analysis is even more complicated when the actual condition of the lawn as a whole and the circumstances of the accident are considered.  Mr. Patterson testified that the lawn was not slippery and he had no trouble traversing it.  Mr. Patterson's testimony confirms that this was a climatic situation where the lawn offered surer footing than a concrete walkway, a circumstance not all that unusual during a Maine winter.  If a reasonable landowner realized that customers were traversing the apparently secure lawn in preference over an icy walkway, she might sand and salt the walkway, not because she feared the customers would slip on the lawn, but because she was concerned that some customers might choose the designated walkway, despite the safer alternative.

But, Mr. Patterson acknowledged that he walked on the lawn without any difficulty and in fact he elected to return the same way, because he came in without difficulty and figured he could return without difficulty.  He managed to slip on the only icy area on his chosen route – at the very end, where ice had formed on the ridge at the edge of Main Street.

In these circumstances, it seems hypercritical to conclude that the Postal Service was negligent.  It would require a determination that a reasonable landowner would obsessively sand and salt the walkway to deter customers from using an apparently safer route, because the lawn route had at its very edge a small area of ice that the customers would encounter, had they not used the walkway.  The Plaintiff's negligence theory seems bottomed on a retrospective negligence analysis – knowing that an accident occurred, what could the Postal Service had done to avoid it.  But, this is not the legal standard for premises liability.  The question is – not knowing that an accident would occur, would a reasonable landowner have concluded that she should have sanded and salted the walkway more frequently, because a small area of a safer alternative route was icy.  Mr. Patterson has failed to convince the Court that the Postal Service breached its duty to exercise due care on the morning of December 23, 2006.

### 3.    Proximate Cause

The fact that Mr. Patterson suffered an off-walkway injury complicates the proximate cause analysis in the same way that it complicated the breach of duty analysis.  The existence of discrete accumulations of ice on the premises – one on the walkway, which is allegedly attributable to negligence, and one on the ridge, which is not – requires that each be run through the proximate cause mill.  Moreover, because Mr. Patterson does not contend that one accumulation caused the other, for the Postal Service to be liable, the Court must determine that the true cause that links them is not a superseding cause, according to the following formulation:

> We have previously defined proximate cause as that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred.  However, the mere occurrence of an intervening cause does not automatically break the chain of causation stemming from the original actor's conduct.  In order to break that chain, the intervening cause must also be a superseding cause, that is, neither anticipated nor reasonably foreseeable.

20

*Ames v Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992) (internal citations and quotation omitted).   Here, the intervening causes – each of which Mr. Patterson must show is not superseding – were (1) his determination that the walkway was too slippery, (2) his election to walk on the grass, both to and from the post office, (3) the hazardous accumulation of ice on the ridge at the edge of the lawn, and (4) his slipping on the hazard.   For these causes not to break the chain of causation stemming from Ms. Bussell's conduct, she must have anticipated or reasonably foreseen them.[8]

Ms. Bussell testified that she knew post office customers who parked on the gravel shoulder of Main Street would access the post office by either cutting across the lawn or using the concrete walkway.   Further, it is reasonable to infer that she knew an ordinary customer would generally avoid an apparently hazardous path in lieu of one that looked safer.   Accordingly, as to the first two of the enumerated causes – Mr. Patterson's appraisal of the walkway and his election to avoid it – a fair inference is that both were anticipated and reasonably foreseeable.   However, whether the third and fourth causes were anticipated and reasonably foreseeable is a matter of pure speculation.   In his closing argument, Mr. Patterson moved on from the proximate cause issue after briefly stating that Ms. Bussell's negligence was a substantial contributing factor that led to his injury.   He did not mention the issue of superseding cause, specifically whether the Postal Service either anticipated or reasonably foresaw the off-walkway hazard and Mr. Patterson's encounter with it.   Moreover, Mr. Patterson is the only witness to have testified that he knew the ridge was icy.   Under these circumstances,

---

[8] In other words, the Postal Service could be liable if Ms. Bussell's maintenance of the walkway posed an unreasonable risk of harm to Mr. Patterson through his own foreseeable actions.   *Restatement (Second) of Torts* § 302 (1965); *cf. Henry v. Brown*, 495 A.2d 324, 327 (Me. 1985) (recognizing § 302 indirect liability).   Section 302 provides, in part, that "[a] negligent act or omission may be one which involves an unreasonable risk of harm to another through . . . the foreseeable action of the other."   *Restatement (Second) of Torts* § 302(b) (1965).

the Court declines his invitation to base a finding of causation merely upon speculation that Ms. Bussell's omissions may have been a substantial contributing factor that led to his injury.

### B.     William Patterson's Comparative Negligence

Although the Court has concluded that Mr. Patterson failed to demonstrate that the United States Postal Service was negligent, because the issue is a close one, the Court addresses the question of whether the Postal Service has demonstrated that Mr. Patterson was himself negligent and whether his negligence equaled or exceeded any negligence of the Postal Service. 14 M.R.S.A. § 156.  The evidence of Mr. Patterson's negligence is compelling.

First, Mr. Patterson was well aware of the weather conditions in Harmony the morning of December 23, 2006.  The freezing rain or sleet was open and obvious and rather than staying home, Mr. Patterson and his wife set out into these uninviting conditions for breakfast and the mail.  There was no evidence that either task was essential.  In other words, this was not a trip to the emergency room; it was a trip to a restaurant and the post office.

Second, when Mr. Patterson arrived at the Harmony post office, he elected to park on the street and proceed from the street across an open lawn to retrieve his mail.  Photographs of the Harmony post office show that there is a parking lot for postal customers adjacent to the building.  As a customer approaches from the parking lot, the exterior wall of the post office is to the person's right, Main Street is to the left, and a wooden canopy covers the length of the walkway from the parking lot to the front door of the post office.  Though partially exposed to the weather from the side, it is logical to infer that the walkway under the canopy was less exposed to the elements than the open lawn.  Although Mr. Patterson testified that the post office parking lot was full when he arrived, there was no evidence that he had to obtain his mail at that very moment.  If Mr. Patterson had wished to avoid the risks presented by crossing the lawn

22

from the street, he had the option to return to his vehicle and wait for a parking space to open in the lot.

Third, Mr. Patterson said that as he alighted from his vehicle and approached the edge of the lawn, he noticed the very same patch of ice on which he later slipped.  He confirmed that he noticed that the ridge to the side of the walkway was slippery.  He decided to proceed over that patch of ice and walk over the lawn to retrieve his mail.

Fourth, Mr. Patterson – like all the other customers – did nothing to alert Ms. Bussell that the exterior conditions were slippery and needed attention.  This was true, despite the fact he knew Ms. Bussell.  When asked why he did not notify her, he said "no particular reason"; "I just get in there okay, and I says, I can get back out okay." *Tr.* 117:21-22.

Fifth, after retrieving his mail, Mr. Patterson elected to proceed directly to his vehicle, heading toward the same patch of ice he had observed when he arrived.

Sixth, when he arrived at the edge of the lawn, he stepped directly on the patch of ice, rather than attempting to walk over or around it.

Seventh, as he stepped on the icy patch, he took no other precautions, such as slowing his gait, holding onto the vehicle, which was within an arm's length, or gingerly testing his footing.  Instead, he simply stepped forward without breaking stride, despite his knowledge of the slippery condition, stepped on it, slipped, and fell.  When asked why he did not put his hands on the vehicle for support as he went over the icy ridge, he said that "it didn't occur to me." *Tr.* 103:12-14.

Eighth, his footwear was generally inappropriate for the conditions.  Mr. Patterson had spent some time in Nashville, Tennessee, and perhaps influenced by the styles of Country music, he was wearing a pair of black leather cowboy boots.  The boots, which were admitted into

23

evidence, have Vibram rubberized soles with heels that are about an inch-and-a-half at the back of the heel and taper to just less than an inch at the front of the heel.  The front portions of the soles have a slightly worn grip pattern, but the heels are smooth.

The accumulated evidence of Mr. Patterson's comparative negligence is overwhelming. Mr. Patterson's testimony confirms that there was only a very small section of his chosen route that posed any hazard.  Instead of avoiding that small icy area or gingerly approaching it, Mr. Patterson headed directly to the icy ridge, stepped right on it, and fell.  The Court readily concludes that Mr. Patterson was substantially comparatively negligent in causing his own injuries.

### C. Balancing the Postal Service's Negligence Against Mr. Patterson's Negligence

The case of negligence against the Postal Service is thin indeed.  It rests on the premise that although the Postal Service salted and sanded the walkway twice that morning, enough time had elapsed in an hour from the last application, that the Postal Service was negligent for failing to salt and sand a third time.  By contrast, Mr. Patterson's own negligence eclipses any negligence on the part of the Postal Service.  He saw the hazard on the way in and elected to encounter it again on the way out.  He chose not to take a potentially safer route from the post office through the parking lot to his vehicle.  He failed to take reasonable precautions by choosing to wear cowboy-style boots in winter conditions, by approaching what he knew to be an icy ridge without special care, and by failing to reach out to steady himself on his vehicle as he came to the icy spot.  Even if the Postal Service may be liable to its invitees for harm caused by certain known or obvious dangers where it should anticipate the harm despite the obviousness of the dangers, this principle does not relieve Mr. Patterson from exercising reasonable care to avoid his own injury when these risks are open and obvious.  *Cf. Colvin v. A R Cable Servs.-ME,*

*Inc.*, 1997 ME 163, ¶ 8, 697 A.2d 1289, 1291 (collecting possessor liability cases that apply *Restatement (Second) of Torts* § 343A (1965)).  In this case, the Court concludes that had he exercised due care, Mr. Patterson, not the Postal Service, was by far and away in the better position to avoid his injuries.

## IV.     CONCLUSION

The Court concludes that the United States Postal Service was not negligent in causing the injuries William Patterson sustained at its premises on December 23, 2006 and, if it was negligent, Mr. Patterson's comparative negligence was equal to or greater than the negligence of the Postal Service.  The Court GRANTS judgment against William Patterson and in favor of Defendant United States of America.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 19th day of February, 2009